## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNIE DE SOUZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  303CV2247 (MRK) |
| | ) | |
| TAP PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF DR. LARRY P. BERSTEIN AND DR. SUZANNE PARISIAN

## INTRODUCTION

Plaintiff alleges in this products liability case that certain eye conditions she is experiencing were caused by the administration of a single injection, in January 2002, of Lupron Depot® 3.75 mg ("Lupron"), a drug manufactured by defendant TAP Pharmaceuticals, Inc. ("TAP") and indicated for, among other things, the treatment of uterine fibroids.  Plaintiff has proffered two expert witnesses, Dr. Larry P. Berstein and Dr. Suzanne Parisian.  Dr. Berstein, a practicing ophthalmologist, submitted a two-sentence expert "report" (which he has since recanted) and purports to testify, based on a flawed "differential diagnosis" and the timing of plaintiff's alleged eye disorder, that Lupron is the cause.  Dr. Parisian, who is a pathologist by

3295766

training, not an ophthalmologist, offers the same argument.  In a verbose and at times inscrutable 45-page report (with nearly 200 pages of irrelevant attachments), Dr. Parisian speculates -- with no factual support whatever -- that TAP might have secretly added some inactive component to the drug's formulation, and concludes that this might be responsible for plaintiff's alleged injury.

Neither of plaintiff's proffered experts should be permitted to testify.  Both rely on pure speculation and a demonstrable distortion of the facts in rendering their opinions.  These experts fail to meet the Supreme Court's mandate in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny, that expert testimony be based on a reliable methodology and "scientific knowledge."  *See Daubert*, 509 U.S. at 592; Fed. R. Evid. 702.  Accordingly, both proffered experts should be excluded.

## FACTUAL BACKGROUND

### I.      This Action

Lupron is an injectable pharmaceutical drug manufactured by TAP that is indicated for, among other conditions, the treatment of uterine fibroids.  (*See* Def.'s Rule 56(a)(1) Stmt. ¶ 1.)[1] Plaintiff is a 34-year-old resident of Connecticut, who in December 2001 was diagnosed by her gynecologist Dr. Edward J. Watson with uterine fibroids.  (Def.'s Rule 56(a)(1) Stmt. ¶ 2.)  In order to treat the fibroids, Dr. Watson prescribed Lupron to plaintiff in the course of a

3295766

-2-

physician/patient relationship.  (*Id.* ¶ 3.)  On January 11, 2002, Dr. Watson administered a single injection of Lupron to plaintiff.  (*Id.* ¶ 4.)  Plaintiff alleges that the next day she began experiencing blurred vision in her right eye.  (*Id.* ¶ 5.)  Plaintiff claims that approximately two weeks later, she experienced blurred vision in her left eye.  (*Id.* ¶ 6.)  When she presented to the emergency room at Yale-New Haven Hospital for this condition, she was diagnosed with aseptic meningitis, a viral condition that Dr. Berstein admits can cause vision problems.  (*See* Ex. A; Deposition Transcript of Larry P. Berstein, M.D. ("Berstein Tr."), relevant excerpts attached as Exhibit B, at 256-61.)

On November 24, 2003, plaintiff filed this action under the Connecticut Product Liability Act, alleging that the single injection of Lupron she received caused her to suffer an ophthalmologic injury that persists to today.[2]

## II.    Dr. Larry P. Berstein

Dr. Berstein is an ophthalmologist who maintains a practice in New York and a teaching post at Albert Einstein College of Medicine.  (*See* Berstein Tr. at 5, 32, 50.)  Dr. Berstein opines that plaintiff's single injection of Lupron on January 11, 2002 caused her to suffer certain eye

---

(continued…)

[1] To avoid duplication, TAP will refer to its Rule 56(a)(1) Statement of Facts, which was filed on this same date in support of TAP's motion for summary judgment, for certain facts supporting this motion.

[2] Plaintiff also claimed that she suffered headaches and hot flashes as a result of the Lupron therapy, but neither of those alleged side effects is the subject of her experts' opinions.

3295766

injuries.  Dr. Berstein testified that before being retained in this case, he had never heard of Lupron (*id.* at 27), that he has never before offered an opinion in a case that a pharmaceutical drug caused an ophthalmologic reaction (*id.* at 83-84), and that he has never treated a patient who complained of eye problems due to Lupron.  (*Id.* at 276.)

On or about November 11, 2003, Dr. Berstein sent a letter to plaintiff's counsel, which was tendered to TAP on June 15, 2004 as Dr. Berstein's Rule 26(a)(2) report.  (*See* Ex. C; Berstein Tr. at 28-29, 87-89.)  Apart from a brief recitation of Dr. Berstein's credentials and a list of materials that he reviewed before issuing his report, the entirety of the report states:

> Based upon a review of the above information provided, it is my expert medical opinion that, within a reasonable degree of medical certainty, Connie DeSouza's papilledema is consistent with pseudotumor cerebri.  This is a likely result of the injection of Lupron medication on January 11, 2002.

(Ex. C.)  Dr. Berstein offered this opinion despite having never examined plaintiff, or consulting any of her treating physicians, and without reviewing either the pleadings in the case, or the expert report of TAP's neuro-ophthalmologic expert, Dr. Michael A. Rosenberg.  (*See* Berstein Tr. at 31, 92, 200-01.)

Dr. Berstein was deposed on March 7 and 29, 2005, at which time he recanted his diagnosis of papilledema and pseudotumor cerebri, calling his Rule 26(a)(2) report "preliminary."  (*Id.* at 87-88, 97-100, 104-05.)  Papilledema and pseudotumor cerebri are

3295766

-4-

ophthalmologic conditions marked by increased intracranial pressure, which is diagnosed by analyzing a patient's opening pressure from a lumbar puncture.  (*See id.*; Declaration of Dr. Michael A. Rosenberg ("Rosenberg Decl."), a copy of which is attached as Exhibit D, ¶ 4.)[3]  It is undisputed that plaintiff's medical records indicate that she did *not* have increased intracranial pressure.  (*See* Berstein Tr. at 107; Rosenberg Decl. ¶ 5.)  There was never a time -- not when Dr. Berstein drafted his report, nor when it was served on TAP, nor at his deposition -- that the objective evidence permitted a diagnosis of papilledema and pseudotumor cerebri.  (*See* Rosenberg Decl. ¶ 6.)  At his deposition, Dr. Berstein tried unconvincingly to back away from the unequivocal opinion he rendered in his Rule 26(a)(2) report, stating that based on the medical records, "Her papilledema *would be* consistent with pseudotumor cerebri, *if* she had that, but I no longer believe we can support that she had pseudotumor cerebri."  (Berstein Tr. at 111-12 (emphasis added).)  Dr. Berstein had no real answer for why he felt he could support that diagnosis in the first place, given that the only objective evidence was to the contrary.  (*Id.* at 111-19.)

Rather, at his deposition, Dr. Berstein simply "revised" his opinion to state that plaintiff instead has optic disk edema, which is not marked by increased intracranial pressure, which he

---

[3] Dr. Rosenberg is a Rule 26(a)(2) testifying expert witness for TAP in this matter.  He is Associate Chairman and Associate Professor of the Department of Ophthalmology, Northwestern University Medical School, Chicago, Illinois.  He is also the Chief of the Neuro-ophthalmology Section in that Department.  (*See* Rosenberg Decl. ¶ 2.)

3295766

then says was caused by Lupron.  (*See* Berstein Tr. at 99-100, 103-04, 117, 129-32.)  Just as his "preliminary" opinion was ultimately proven wrong (by Dr. Berstein's own admission), this "revised" opinion fails to withstand *Daubert* scrutiny.  Dr. Berstein's opinion is the product of speculation, a lack of knowledge of certain immutable facts, and faulty methodology, and it should be excluded.

### III.   Dr. Suzanne Parisian

Dr. Parisian is a pathologist who previously worked as a medical examiner and a medical officer with the United States Food and Drug Administration's Center for Devices and Radiological Health.  (*See* Expert Report of Suzanne Parisian, M.D. ("Parisian Report"), a copy of which is attached as Exhibit E, ¶¶ 1-3; Curriculum Vitae of Suzanne Parisian, M.D. ("Parisian C.V."), a copy of which is attached as Exhibit F, at 1-2, 12.)  Since 1995, she has operated Medical Device Assistance, Inc., a consulting firm "regarding FDA's requirements, Adverse Event Reporting, and labeling of FDA-regulated products."  (Parisian Report ¶ 11.)

Dr. Parisian submitted a 45-page "report" for this case that includes four irrelevant attachments that total approximately 200 pages.  Although the report is far from a model of clarity, Dr. Parisian attempts to offer essentially two opinions.  First, she speculates that since Lupron was first marketed, TAP has secretly altered the drug's formulation and manufacturing process, which resulted in TAP adding to Lupron undisclosed "inactive ingredients,"

3295766

"excipients," "contaminants," or "preservatives." (*Id.* ¶¶ 37, 38, 41, 56.)   According to Dr. Parisian, these undisclosed components caused plaintiff's alleged injuries. (*Id.*)   Second, Dr. Parisian opines that unidentified "manufacturing issues" associated with Lupron's time release mechanism caused the drug both to degrade too quickly *and* too slowly in plaintiff's body, which she argues caused and exacerbated the alleged eye problem. (*See id.* ¶¶ 32-33, 54-55.)   Because neither of Dr. Parisian's opinions has any basis in fact, she should be excluded.

## LEGAL STANDARD

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court emphasized the "gatekeeping role" of trial courts in determining the admissibility of proffered expert testimony under Fed. R. Evid. 702. *Daubert*, 509 U.S. at 597; *Kumho Tire*, 526 U.S. at 141, 152.   In making this determination, the Supreme Court stated that courts must analyze both the relevance and the reliability of the testimony. *See Daubert*, 509 U.S. at 589; *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2nd Cir. 2002).   Testimony is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than without the evidence." *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 401). Testimony is reliable under *Daubert* if it constitutes *scientific knowledge*. *Daubert*, 509 U.S. at 592.   "The adjective 'scientific' implies a grounding in the methods and procedures of science"

3295766

and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590.  In determining reliability, courts should consider "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is 'the product of reliable principles and methods;' and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702); *see also Pugliano v. United States*, 315 F. Supp. 2d 197, 199 (D. Conn. 2004).  Courts also "must make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos*, 303 F.3d at 265-66 (quoting *Kumho Tire*, 526 U.S. at 152).

In resolving a motion brought under *Daubert* and Rule 702, district courts are empowered with "broad discretion" to exclude improper expert testimony.  *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir. 1999) (evidentiary rulings are reviewed for abuse of discretion).  At all times, the proponent of expert testimony bears the burden of establishing that the admissibility requirements are met by a preponderance of the evidence.  *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).  As demonstrated below, plaintiff fails to meet that burden in this case.

3295766

**ARGUMENT**

**I.     Dr. Berstein Should Be Barred From Testifying In This Case.**

Dr. Berstein opines that plaintiff's optic disk edema was caused by the injection of Lupron she received on January 11, 2002.  (*See* Berstein Tr. at 99-100, 103-04, 129-32.)  He bases this opinion on: (1) his "differential diagnosis," which he claims eliminated all other possible causes, and (2) the "temporal relationship" between plaintiff's receiving the Lupron shot and the alleged, blurry vision in her right eye the following morning.  (*Id.* at 24-28, 132-36.) However, as Dr. Berstein's testimony reveals, and as other *undisputed* evidence confirms, there is no medical or scientific basis for his subjective conclusion regarding the cause of the alleged injury.  In fact, the totality of the evidence shows that Dr. Berstein's opinion rests on speculation and a misapprehension of the facts, all of which render his opinions unreliable and inadmissible under *Daubert.  See* 509 U.S. at 590-92 (holding that expert testimony must be based on scientific knowledge, which "connotes more than subjective belief or unsupported speculation").

**A.     Dr. Berstein's Conclusion That "Some Component" of Lupron Caused Plaintiff's Injuries Is Pure Conjecture and Must Be Excluded.**

Dr. Berstein claims to have used a "differential diagnosis" to reach his conclusion that, among all potential candidates for causation, Lupron was the only possible cause of plaintiff's

3295766

eye injuries.  (Berstein Tr. at 132-36.)[4]  A differential diagnosis involves "ruling in" possible causal agents of a medical condition and then ruling them out one-by-one using objective criteria, until only one possible agent is left (or a most probable agent, if more than one is left). *See Caraker v. Sandoz Pharm. Corp.*, 188 F. Supp. 2d 1026, 1030 (S.D. Ill. 2001); Berstein Tr. at 132-36.

While some courts have found a differential diagnosis to be a reliable methodology "in the abstract," if it is employed "in the practice of science (as opposed to its use by treating physicians in the practice of medicine out of necessity) it must *reliably* 'rule in' a potential cause." *Id.* (emphasis in original) (citations omitted); *see also Prohaska v. Sofamor, S.N.C.,* 138 F. Supp. 2d 422, 439 (W.D.N.Y. 2001) (in order for conclusions drawn from a differential diagnosis to be admissible, the diagnosis must be conducted with "intellectual rigor"); *Johnson Elec. North Am., Inc. v . Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 282-85 (S.D.N.Y. 2000) ("However, even where an expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible").  Thus, if the "ruling in" step is not supported by a sufficiently reliable factual predicate, the expert's entire opinion is

---

[4] Among the several other possible causes of plaintiff's injuries that Dr. Berstein considered and rejected were plaintiff being diagnosed with meningitis, a condition which Dr. Berstein admits can cause vision problems (*see* Berstein Tr. at 256-61; Deposition Transcript of Connie J. DeSouza, relevant excerpts of which are attached as Exhibit G, at 84-87), and plaintiff's ingestion of the drugs Motrin and Gentamycin, both of which have package inserts that warn for ophthalmologic side effects (*see* Berstein Tr. at 178-86, 203-07).

3295766

subject to exclusion.  *See Caraker*, 188 F. Supp. 2d at 1030; *Amorgianos*, 303 F.3d at 267 (an expert's analysis must be reliable "at every step;" if not, the testimony is inadmissible).

Here, when pressed for facts and evidence that support his "ruling in" Lupron as the particular cause of plaintiff's injuries, Dr. Berstein could only speculate that "some component" of Lupron triggered plaintiff's vision problems.  (*See* Berstein Tr. at 103, 133.)  Tellingly, Dr. Berstein was unable to explain, in any respect, how Lupron allegedly caused plaintiff's edema.  (*Id.* at 212-17.)  Moreover, despite there being no support in the medical literature for his theory that a component of Lupron can cause optic disk edema (*id.* at 218), Dr. Berstein undertook *no* effort to attempt to corroborate his theory.  In fact, Dr. Berstein conducted no research, tests, studies or trials in order to verify that an unknown, unidentified component of Lupron could (or did) cause the type of ophthalmologic injury plaintiff alleges.  (*Id.* at 217-18.)  Instead, as the following testimony reveals, he was satisfied to leave it to others to "hopefully" identify the particular mechanism that might support a theory that he -- and he alone -- espouses:

> Q      So you don't feel the need to identify what the particular causative factor was in Lupron in order to state within a reasonable degree of medical certainty that it was the Lupron that caused [plaintiff's] eye problems?
>
> *          *          *          *
>
> A      [E]very diligence *should be* done in order to find out which component or components were involved.  The chips will fall where they may and the exact mechanism and ideology [sic] and

3295766

-11-

> which particular component of the injection is responsible
> *hopefully* will be determined so that it can be remedied.

(*Id.* at 215-17.)  Dr. Berstein further admitted that the alleged "causative factor" in Lupron "has yet to be scientifically and precisely determined" by him or anyone else.  (*Id.* at 229.)

It is clear that Dr. Berstein's conclusion regarding causation derives from speculation which he made no effort to confirm or deny, even though he testified that "every diligence" should have been made to do so.  (*Id.*)  By his own admission, Dr. Berstein has failed to employ in this case "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Amorgianos*, 303 F.3d at 265-66.  For that reason alone, Dr. Berstein should be barred from testifying.  *See, e.g., id.* at 266 ("Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 *mandate* the exclusion of that unreliable opinion testimony") (emphasis added); *Pugliano*, 315 F. Supp. 2d at 199 (excluding testimony that was not based on a reliable factual foundation, but was "merely the product of [the expert's] subjective belief and unsupported speculation").

What Dr. Berstein did do was conduct an "academic exercise" to divide Lupron "artificially" into three components:  active ingredients, disclosed inactive ingredients, and "undisclosed" inactive ingredients so as to theorize about a possible cause.  (*See* Berstein Tr. at

213-14, 237.)  However, there are no undisclosed inactive ingredients, and the categorization of Lupron in order to attribute causality fails to survive scrutiny under *Daubert.*

First, Dr. Berstein himself expressly disclaims that the active ingredient in Lupron, leuprolide acetate (*id.* at 231), caused the alleged injuries.  Indeed, he testified, "I do not believe that it's the active hormonal ingredient that could've possibly caused [the visual problems] in a hormonal way, by its underlying mechanism of action, that it could not have caused within 12 hours the onset of the symptoms.  Because I do not believe the hormonal changes would've happened that quickly."  *Id.* at 156; *see also id.* at 223-24.  Thus, he admits that one of the three Lupron components in his artificial academic exercise is not the cause of plaintiff's injuries.

The same is true of the second component:  disclosed inactive ingredients.  In fact, while Dr. Berstein baldly concludes that disclosed inactive ingredients may be the culpable agent (*see id.* at 214, 223-24), he offers absolutely no factual support for such theory.   He even acknowledges that he is aware of nothing in the medical literature that ties any of the disclosed inactive ingredients in Lupron to the type of ophthalmologic problems alleged by plaintiff.  (*Id.* at 158, 233.)  There is good reason for this absence of support for his theory:  it is undisputed that *none* of the disclosed ingredients in Lupron (whether active or inactive) are associated with permanent ophthalmologic injuries.  (*See* Rosenberg Decl. ¶¶ 8-9.)   The disclosed inactive ingredients, thus, cannot be linked with any scientific reliability to plaintiff's alleged eye injury.

3295766

-13-

Finally, there is absolutely no support for Dr. Berstein's wildly speculative theory that "undisclosed" inactive ingredients in Lupron caused the injury alleged. Indeed, there simply are *no* undisclosed ingredients (active or inactive) in Lupron. As Dr. Rajneesh Taneja, Research Program Manager in TAP's Pharmaceutical Development Department, testified, the package insert for Lupron affirmatively discloses *all* of the ingredients and components of Lupron. (*See* Deposition Transcript of Dr. Rajneesh Taneja ("Taneja Tr."), relevant excerpts of which are attached as Exhibit H, at 64-65.)[5] This uncontroverted evidence renders Dr. Berstein's argument a non-starter. Moreover, Dr. Berstein's own testimony reveals the purely speculative and unreliable nature of his position. In fact, in promoting his theory about the causative effect of undisclosed inactive ingredients in Lupron, Dr. Berstein acknowledges that he is merely "unsure" whether the package insert lists all of the ingredients of Lupron, that "he could be wrong" about that, and that the existence of such undisclosed inactive ingredients is "just a theoretical possibility." (*See* Berstein Tr. at 209-12.) Most telling, Dr. Berstein plainly admits that he has "no evidence of the existence" of such undisclosed inactive ingredients. (*Id.* at 232-33.) This testimony confirms that Dr. Berstein's conjectural theories of causation cannot meet the evidentiary threshold established by *Daubert* and Rule 702. *See, e.g., Boucher v. Suzuki*

---

[5] Dr. Taneja was produced by TAP pursuant to plaintiff's Rule 30(b)(6) notice, which requested production of "the Representative of TAP PHARMACEUTICALS with the most knowledge regarding any changes in the formulation of active and inactive ingredients of Lupron 3.75 mg, from its inception to the present, as well as any reasons for such changes . . . ." (*See* Ex I.)

3295766

*Motor Corp.*, 73 F.3d 18, 21 (2ⁿᵈ Cir. 1996) ("Expert testimony should be excluded if it is speculative or conjectural"); *Zaremba v. General Motors Corp.*, 360 F.3d 355, 358 (2ⁿᵈ Cir. 2004) (excluding expert testimony which was "speculative and unreliable"); *Montefiore v. American Protection Ins.*, No. 00Civ.3235, 2003 WL 21108232, at *2-3 (S.D.N.Y. May 14, 2003) (same);[6] *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F. Supp. 2d 491, 496 (E.D.N.Y 2002) (same). Accordingly, Dr. Berstein should be barred from testifying.

> **B.     Dr.  Berstein's  Reliance  on  a  Temporal  Connection  Between  the Administration of Lupron and the Onset of Plaintiff's Alleged Injuries Provides No Support for His Causation Opinion.**

Dr. Berstein's methodology of relying on the timing between the administration of Lupron and plaintiff's alleged eye injury also fails to pass muster under *Daubert* and Rule 702, because it, too, is speculative and unreliable.  Dr. Berstein's opinion that the 12-hour window between the Lupron injection and the onset of plaintiff's alleged eye injury is proof of cause and effect rests on an unfulfilled contingency and total speculation.  Dr. Berstein testified:

> Q      At what point does the period from the shot until the onset of vision problems become too attenuated that there is no longer a temporal association?
>
> A      If her optic nerves got sick before she got injected, there would not be an association.  If her optic nerves got sick after she got injected and there's no other explanation, there's some relationship there.  **When *this thing is finally figured out and***

---

[6] A copy of this opinion is attached as Exhibit J.

3295766

-15-

> ***whatever*** *biologically and biochemically happened,* ***when*** *it's finally ascertained as to what the mechanism was, there is no -- it is my opinion that the 12 hour time frame* ***will*** *make perfect sense.*
>
> *        *        *        *
>
> *My opinion further is that the 12 hour window* ***will be compatible with whatever*** *-- and will be part of figuring out the underlying mechanism as to how and why it unfortunately happened.  That's all I'm trying to say.*

(Berstein Tr. at 139, 140-41 (emphases added).)

Just as he did with his opinion that there might exist some secret component in Lupron, Dr. Berstein bases this opinion on unknown facts, research not yet conducted or located, and clear speculation.   And, his opinion relies *expressly* on the occurrence of a condition that he admits has not been met.  *Daubert* and Rule 702 require testimony that is grounded on a "reliable foundation" of *facts* and *data*, not speculation and wishful thinking.  *Daubert*, 509 U.S. at 597; *see also id.* at 590-92 (holding that expert testimony must be based on "scientific knowledge;" knowledge "connotes more than subjective belief or unsupported speculation"); *Amorgianos*, 303 F.3d at 265-66; Fed. R. Evid. 702.

Dr. Berstein's opinion should also be excluded because it is fundamentally unhelpful to the jury and fails to rise to the level of an "expert" opinion.  Indeed, Dr. Berstein provides no scientific or factual evidence that would permit him to ascribe any medical significance to the timing of certain events in this case.  Dr. Berstein's testimony is simply this:

3295766

> Q      [W]hat is it about the temporal connection that led you to
> believe that Lupron was the cause of the optic disk edema[?]
>
> *        *        *        *
>
> A      She didn't have it before the injection and she had it
> afterwards.

(Berstein Tr. at 132-33; *see also id.* at 139-40 ("Q:  What time frame would not make perfect sense?  A:  If she got sick before the shot, it would not make perfect sense.  And if she got sick after the shot, it makes sense.").)

This elementary observation is well within the province of the fact-finder, and is therefore an improper subject of expert testimony.[7]  *See, e.g.*, *United States v. Benson*, 941 F.2d 598, 604 (7th Cir.), *mandate recalled and amended on other grounds by* 957 F.2d 301 (1992) (reversing trial court's admission of purported expert testimony and stating, "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert") (emphasis in original); *cf. Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (excluding expert

---

[7] On the other hand, Dr. Richard Blackwell, TAP's expert in this matter in the fields of obstetrics, gynecology, and reproductive biology and endocrinology, offers testimony rooted in scientific fact that the 12-hour period between the Lupron shot and the onset of plaintiff's alleged eye injury necessarily means that the Lupron *could not* have been the cause of those injuries.  (*See* Declaration of Richard E. Blackwell, a copy of which is attached as Exhibit K, ¶¶ 9-11.)

3295766

-17-

testimony where it was "no more than [plaintiff's] testimony dressed up and sanctified as the opinion of an expert").

For all of the foregoing reasons, Dr. Berstein should be excluded from testifying as an expert in this case.

**II.     Dr. Parisian Should Be Barred from Testifying in this Case.**

**A.     Dr. Parisian Is Not Qualified To Render Expert Opinions Concerning Ophthalmologic Issues or FDA's Regulation of Drugs.**

A witness cannot testify as an expert without first being deemed qualified to do so.  *See, e.g., United States v. Pugliese*, 712 F.2d 1574, 1581 (2nd Cir. 1983).  Generally, an expert may be qualified by skill, knowledge, experience, training or education.  *See* Fed. R. Evid. 702.  Here, Dr. Parisian attempts to opine concerning (i) the ophthalmologic injuries alleged by plaintiff, including causation, and (ii) FDA regulations and procedures relating to pharmaceutical drugs, including alleged actions or omissions that she attributes to TAP in connection with its reporting duties to FDA.  (*See, e.g.,* Parisian Report ¶¶ 13-17, 40-41, 52-57.)  Dr. Parisian is not qualified to opine on either subject.

First, Dr. Parisian is not qualified to opine on ophthalmologic issues.  She is not an ophthalmologist, has never received training as an ophthalmologist, and has never practiced in the field of ophthalmology.  (*See* Parisian Report ¶¶ 1-3; Parisian C.V. at 1-2, 12.)  Dr. Parisian is a pathologist and her only experience in the medical field is in that specialty and as working as

3295766

-18-

a medical examiner.  (*Id.*)  Accordingly, she fails to possess the necessary education, training and experience to opine on ophthalmologic issues, including those relating to an attribution of any such injuries to a particular cause.  *See* Fed. R. Evid. 702; *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1389-90 (C.D. Ill. 1992) (barring medical doctor's purported expert testimony where the "witness attempts to give an opinion on a subject for which he is not qualified. . . .  The Rules recognize that there is some limit to every expert's expertise and that he can not be allowed to go beyond it"); *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 568 (W.D. Pa. 2003) (barring doctor's purported expert testimony because "testimony outside expert's area of expertise should be excluded") (citation omitted); *Smith v. Wyeth-Ayerst Laboratories Co.*, 278 F. Supp. 2d 684, 697-98 (W.D.N.C. 2003) (barring physicians' purported expert testimony because "any expert, including physicians, must have the specialized knowledge or skill in the specific area in which the testimony is proffered").

Second, Dr. Parisian is not qualified to offer an expert opinion concerning the FDA's regulation of pharmaceutical drugs like Lupron.  Dr. Parisian's experience regarding FDA regulatory issues is confined solely to the area of medical devices, not drugs.  From 1991-95, she worked in the FDA's Center for Devices and Radiological Health and Office for Device Evaluation.  (*See* Parisian Report ¶¶ 1-3.)  In this capacity, Dr. Parisian was "responsible for the premarketing evaluation of product applications submitted by manufacturers to commercially

3295766

-19-

market *devices* that are safe and effective within the United States."  (*Id.* ¶ 3 (emphasis added).)
After leaving FDA, Dr. Parisian founded Medical Device Assistance, Inc., a consulting firm
"regarding FDA's requirements, Adverse Event Reporting, and labeling of FDA-regulated
products."  (*Id.* ¶ 11.)

The FDA regulatory system pertaining to drugs is distinct and different from that relating
to devices.  First, devices and drugs are regulated by wholly separate divisions in FDA; drugs are
regulated by the Center for Drug Evaluation and Research (CDER) and devices by the Center for
Devices and Radiological Health (CDRH).  (*See* Declaration of Michael J. Hensley ("Hensley
Decl."), a copy of which is attached as Exhibit L, ¶ 5.)[8]  Dr. Parisian has never worked for the
CDER.  (*See* Parisian C.V.)  Moreover, the regulation of drugs and devices differs in many
significant respects, including by the laws and regulations that apply to each field, the safety
reporting requirements, and the classification of adverse events.  (*See* Hensley Decl. ¶¶ 5-8.)
Because Dr. Parisian has no experience or training regarding FDA's regulation of drugs, she is
not qualified to offer expert testimony on that subject in this case.  *See, e.g., id.* ¶ 9; Fed. R. Evid.
702; *O'Conner*, 807 F. Supp. at 1389-90; *Soldo*, 244 F. Supp. 2d at 568; *Smith*, 278 F. Supp. 2d
at 697-98.  Accordingly, Dr. Parisian should be excluded from this matter.

---

[8] Dr. Hensley is a Rule 26(a)(2) expert witness for TAP.  He is President of Hensley & Pilc, Inc., a
pharmaceutical industry consulting firm, and previously worked at the FDA as a medical officer in the Division of
Scientific Investigations, within what was then the Bureau of Drugs.  (*See* Hensley Decl. ¶¶ 1-3.)

3295766

**B.      Dr. Parisian's Opinion That Lupron Caused Plaintiff's Alleged Injury Is Not Reliable and Should Be Excluded.**

Even if Dr. Parisian were qualified to testify about ophthalmologic disorders, which she is not, the opinion that she purports to offer, that the single injection of Lupron administered to plaintiff was the cause of her alleged injury, fails to meet the reliability threshold established by *Daubert* and Fed. R. Evid. 702.  Her testimony should therefore be excluded.

Dr. Parisian essentially attempts to conduct a differential diagnosis, without expressly calling her "methodology" by that name as Dr. Berstein does.  Dr. Parisian first excludes what she deems to be the other possible causes of the alleged injury (*see* Parisian Report ¶ 15), and then "rules in" Lupron as the likely cause, stating that "to a reasonable degree of medical certainty" the "permanent injuries including vision loss were most consistent with an immunological response associated with receipt of Lupron DEPOT."  (*Id.* ¶ 17.)  However, because Dr. Parisian's attempt at conducting a differential diagnosis is not based on reliable *facts*, as it must be (*see supra*, Part I.A.), it should be excluded.  As demonstrated below, Dr. Parisian attempts to "rule in" Lupron as the cause of plaintiff's alleged injury through several different theories, each of which fails to withstand scrutiny under *Daubert* and Fed. R. Evid. 702.

3295766

1.      **Dr. Parisian's Theory That Unidentified Components in Lupron Caused Plaintiff's Alleged Injury Has No Basis in Fact.**

Dr. Parisian alleges that based on a review of patents and patent applications that she claims relate to the various formulations of Lupron (not necessarily the 3.75 mg strength at issue here), TAP has altered the drug's formulation and manufacturing process (which she says TAP never disclosed to the FDA), which resulted in TAP adding to Lupron undisclosed "inactive ingredients," "excipients," "contaminants," or "preservatives."  (*See* Parisian Report ¶¶ 37, 38, 41, 56.)  It is these undisclosed additives, Dr. Parisian argues, that caused plaintiff's alleged injury.  (*Id.*)  Dr. Parisian's theory has absolutely no factual or scientific merit.

First, Dr. Parisian bases her theory that TAP secretly changed Lupron's formulation and manufacturing process on unspecified "US patents" and patent applications that may not even relate to the particular product -- Lupron Depot® 3.75 mg -- at issue in this case.  (*Id.* ¶¶ 26, 41.)  Dr. Parisian fails even to identify the particular patents she relies on; moreover, she seems to rely on patent *applications*, which may not have ever resulted in an issued patent.  (*Id.*)  Regardless, it is undisputed that a change in a patent does not necessarily correspond to the same (or any) change in the drug to which the patent relates.  (*See* Hensley Decl. ¶¶ 10-12.)   The implementation of formulation and manufacturing changes in drugs is governed by FDA regulations and procedures, not patent applications submitted to or patents issued by the U.S. Patent and Trademark Office.  (*Id.*)  It is further undisputed that TAP *has not* changed the

3295766

-22-

formulation or manufacturing process of Lupron since the drug's inception. (*See* Taneja Tr. at 23-27, 67-68.) Thus, Dr. Parisian has not and can not offer any evidence whatsoever that TAP altered the formulation and manufacturing process of Lupron in *any* respect, much less in any way that supports her causation theory. Dr. Parisian should therefore be excluded. *See Daubert*, 509 U.S. at 590-92 (holding that expert testimony must be based on scientific knowledge, which "connotes more than subjective belief or unsupported speculation").

Second, that there were no changes in Lupron's formulation or manufacturing process also puts to rest Dr. Parisian's conjecture that these hypothetical changes "may, or may not, have been provided to FDA." (*See* Parisian Report ¶ 37.) That statement is not only transparently speculative and therefore inadmissible under *Daubert*, but also demonstrably *false*, given Dr. Taneja's uncontroverted testimony that Lupron has not undergone any such changes, and that all of the ingredients in Lupron are disclosed on the package insert. (*See* Taneja Tr. at 23-27, 64, 65, 67-68.)[9]

---

[9] Similarly, there is no evidentiary value to Dr. Parisian's wildly speculative allegation that TAP employed an "internal scheme or standard operating procedure" whereby TAP "may or may not have" disclosed to FDA reports of eye injuries allegedly suffered by Lupron users. (Parisian Report ¶¶ 52-53.) First, Dr. Parisian provides absolutely no support for the allegation that these reports even exist, much less that TAP intentionally withheld them from the FDA. Her reliance on rank conjecture over factual evidence is clearly not admissible under *Daubert*. *See, e.g.*, *Boucher*, 73 F.3d at 21 ("Expert testimony should be excluded if it is speculative or conjectural"); *Zaremba*, 360 F.3d at 358 (excluding expert testimony which was "speculative and unreliable"). Moreover, Dr. Parisian alleges that these unidentified adverse event reports relate to "all formulations of Lupron," and to male and female users of the drug. (*Id.*) The only issue in this case is whether a single injection of Lupron Depot® 3.75 mg caused an alleged ophthalmologic injury in plaintiff, a female. The contents of unidentified, speculative reports relating to drug formulations and users outside of those parameters bear no relevance to this action. Dr. Parisian's testimony

3295766

-23-

Third, Dr. Taneja's testimony also renders unsupportable Dr. Parisian's theory that in purportedly misleading the FDA, TAP added to Lupron undisclosed "inactive ingredients," "contaminants," or "preservatives." (*See* Parisian Report ¶¶ 37, 38, 41, 56.) The undisputed *facts* show that the package insert for Lupron affirmatively discloses *all* of the ingredients and components of Lupron, and that Lupron contains *no* preservatives. (*See* Taneja Tr. at 20, 22, 56, 64-65; Ex. M at 14 ("the product does not contain a preservative"); *supra* Part I.A..)[10] And, just like Dr. Berstein, Dr. Parisian acknowledges -- in her own report, no less -- the speculative nature of her theory regarding undisclosed ingredients, stating merely that there are "*potential inactive ingredients and contaminants*" in Lupron. (Parisian Report ¶ 56.) This is plainly insufficient under *Daubert* and Rule 702, and Dr. Parisian must be excluded. *See, e.g.*, *Boucher*, 73 F.3d at 21 ("Expert testimony should be excluded if it is speculative or conjectural"); *Zaremba*, 360 F.3d at 358 (excluding expert testimony which was "speculative and unreliable").

---

(continued...)

should be excluded for that reason as well. *See Amorgianos*, 303 F.3d at 265 (expert testimony must be relevant to the action in which it is offered).

[10] As Dr. Taneja testified, Lupron indeed contains "excipients" (Taneja Tr. at 20-21), which are "inert substance[s] used as a diluent or vehicle for a drug." *The American Heritage Dictionary of the American Language*, 4th Ed. (2000). But, these excipients (and the remaining ingredients in Lupron) are all affirmatively disclosed on the package insert (*see* Ex. M, p. 1; Taneja Tr. at 64-65), which also warns patients with hypersensitivity to those substances. (*See* Ex. M, p. 4.) Moreover, Dr. Rosenberg confirms that *none* of the ingredients in Lupron, including the excipients, can cause the type of ophthalmologic injury that plaintiff alleges in this case. (*See* Rosenberg Decl. ¶¶ 8-9.)

3295766

-24-

Finally, there is no basis whatsoever for Dr. Parisian's opinion that the undisclosed ingredients she claims TAP added to Lupron (which unquestionably never happened) caused the ophthalmologic injury alleged here.  Indeed, Dr. Parisian never even *identifies* these alleged additives.  For her simply to conclude that some unknown, unidentified agents could cause the particular reactions of which plaintiff complains is transparently speculative and baseless.  That provides yet another, independent reason to bar Dr. Parisian in this matter.  *See, e.g., id.*

> **2.     Dr. Parisian's Theory That the Lupron Received by Plaintiff Exhibited Both a Rapid Release *and* Prolonged Release of the Drug Has No Basis in Fact.**

Lupron is a time-released drug such that it "provides plasma concentrations of leuprolide acetate over a period of one month."  (Ex. M at 1.)  Dr. Parisian recognizes the time-released nature of the formulation, but in order to attribute plaintiff's alleged injury to Lupron, Dr. Parisian opines that unidentified "manufacturing issues" associated with Lupron caused the drug both to degrade too quickly (resulting in a "rapid burst" of the drug within the first 12 hours of the injection) *and* too slowly over a period of more than one month, which permitted plaintiff's injury to be exacerbated.  (*See* Parisian Report ¶¶ 32-33, 54-55.)  This opinion also fails to pass muster.

First, Dr. Parisian provides absolutely no factual basis for her speculation that TAP experienced any "manufacturing issues" with respect to Lupron.  She merely states that she has

3295766

-25-

reviewed unspecified and non-referenced "drug delivery literature" and "United States Patents." (*Id.* ¶ 54.)  Second, Dr. Parisian fails to identify what the "manufacturing issues" were, when they occurred relative to when plaintiff received Lupron, whether the issues affected the particular lot of Lupron with which plaintiff was injected, or how the issues could possibly result in producing both an unintended rapid burst *and* sustained release of the drug.[11]  The entire hypothesis is unsupported speculation.

Indeed, Dr. Parisian admits that there merely "*appear to have been*" instances of rapid and sustained release of Lupron, and that plaintiff's symptoms were consistent with the "potential" of such an event occurring.  (*Id.* ¶¶ 54-55 (emphasis added); *see also id.* ¶ 32 (alleged sustained release of Lupron "*possibly would* continue to have clinical effects throughout many more months of 2002" (emphasis added).)  Dr. Parisian should be excluded accordingly.  *See, e.g., Daubert*, 509 U.S. at 590-92 (holding that expert testimony must be based on "scientific knowledge;" knowledge "connotes more than subjective belief or unsupported speculation"); *Amorgianos*, 303 F.3d at 266 ("Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702

_____

[11] TAP experts Dr. Blackwell and Dr. Rosenberg, both of whom, unlike Dr. Parisian, are qualified to offer testimony in the relevant fields of reproductive biology and ophthalmology, respectively, provide conclusive evidence that a Lupron injection is *not* capable of producing either an initial free release of the drug or a sustained release that could cause a permanent ophthalmologic disorder.  (*See* Deposition Transcript of Richard E. Blackwell, relevant excerpts of which are attached as Exhibit n, at 43-45, 49-50, 56-58, 82-82, 89, 92; Rosenberg Decl. ¶¶ 7-9.)

3295766

-26-

*mandate* the exclusion of that unreliable opinion testimony") (emphasis added); *Pugliano*, 315 F. Supp. 2d at 199 (excluding testimony that was not based on a reliable factual foundation, but was "merely the product of [the expert's] subjective belief and unsupported speculation").

      **C.**     **Dr. Parisian's Opinion that the Lupron Package Insert Is Misleading and Inadequate Is Unreliable and Should Be Excluded.**

      After FDA approves a drug for sale, adverse events that occur during treatment with the drug, whether related to the drug or not, may be reported to the manufacturer by consumers or health care professionals. (Hensley Decl. ¶ 14.) The drug manufacturer in turns reports these spontaneous and anecdotal reports to the FDA as part of the manufacturer's obligations under the FDA's "MedWatch" safety information and adverse event reporting program. (*Id.*) Under 21 C.F.R. § 314.80(k), these submissions do not constitute any admission whatsoever regarding causality. (*Id.*) Rather, the purpose of the MedWatch reports and annual adverse event summaries submitted to FDA by drug manufacturers is to facilitate FDA's tracking of adverse events in order to determine the adequacy of a drug's package insert. (*Id.*)

      In her report, Dr. Parisian claims to have undertaken a "quick review" of various, unidentified MedWatch reports relating to unidentified formulations of Lupron, and concluded that some of the types of ophthalmologic reactions captured by these reports (*e.g.,* optic neuritis and blindness) are not sufficiently warned for by the inclusion of the term "Ophthalmologic

disorders" in the package insert for Lupron Depot® 3.75 mg.  (*See* Parisian Report ¶¶ 52, 57, 59.)  This opinion lacks any merit whatsoever and should be excluded.

As explained by Dr. Hensley, TAP's expert in FDA regulatory affairs for drugs, the FDA does not require that every single *particular* adverse reaction be listed on a package insert; to do so would render the package insert for most, if not all, prescription drugs so lengthy and cumbersome as to prove unhelpful to the treating physicians whom it is designed to reach and inform.  (See Hensley Decl. ¶ 16.)  Instead, the FDA requires adverse events to be described in the package insert using a common dictionary of umbrella medical terms, such as "COSTART." (*Id.*)[12]

Of particular relevance to this matter, the FDA in its COSTART system employs the term "Ophthalmic" disorders to describe eye-related adverse events.  (*See* Hensley Decl., Ex. 1.)  And, included within the COSTART term "Ophthalmic disorders" are 64 types of medical disorders, including blindness, optic neuritis, and optic atrophy, the *same three conditions* that Dr. Parisian singles out as not being covered by the warning on the Lupron package insert.  (*See Id.* ¶ 16 & Ex. 1; Parisian Report ¶¶ 52, 57, 59.)  According to the FDA's own system, TAP's use of the umbrella term "Ophthalmologic disorders" adequately warned treating physicians about the types of adverse reactions that Dr. Parisian claims were ignored.  (*See* Hensley Decl. ¶¶ 18-19.)

3295766

-28-

Accordingly, her opinion that the package insert is inadequate and misleading, which is based solely on faulty methodology and unsupported speculation, must be excluded.  *See, e.g., Amorgianos*, 303 F.3d at 266 ("Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 *mandate* the exclusion of that unreliable opinion testimony") (emphasis added); *Pugliano*, 315 F. Supp. 2d at 199 (excluding testimony that was not based on a reliable factual foundation, but was "merely the product of [the expert's] subjective belief and unsupported speculation").

Finally, there is no question that the insert's warning for "Ophthalmologic disorders" included the particular ophthalmologic problems that plaintiff claims *are at issue here*.  Indeed, both plaintiff's treating physician (Dr. Watson) and proffered expert in ophthalmology (Dr. Watson) testified that the adverse reactions that plaintiff allegedly suffered are included in the term "Ophthalmologic disorders."  (*See* Def.'s Rule 56(a)(1) Stmt. ¶ 19.)  Under these circumstances --where TAP unquestionably warned for the very reactions of which plaintiff complains -- it is wholly irrelevant whether the package insert warned for conditions that plaintiff does not even claim to have suffered.  Accordingly, Dr. Parisian's opinion should be

_____

(continued...)

[12] COSTART stands for Coding Symbols for a Thesaurus of Adverse Reaction Terms.  (*See* Hensley Decl., Ex. 1.)

3295766

-29-

excluded.  *See Amorgianos*, 303 F.3d at 265 (expert testimony must be relevant to the action); Fed. R. Evid. 401.

<u>CONCLUSION</u>

For the foregoing reasons, defendant TAP Pharmaceuticals, Inc. respectfully requests the Court to enter an order excluding the testimony of Dr. Larry P. Berstein and Dr. Suzanne Parisian.

Dated:  July 8, 2005                            Respectfully Submitted,

                                                TAP PHARMACEUTICALS, INC.


                                                By:/s/ Thomas J. Riley
                                                    Thomas J. Riley
                                                    Federal Bar No. CT05686
                                                    Tobin, Carberry, O'Malley,
                                                      Riley & Selinger, P.C.
                                                    43 Broad Street, P.O. Box 58
                                                    New London, CT  06320
                                                    Tel:  (860) 447-0335
                                                    Fax:  (860) 447-9143
                                                    Email:  tjriley@tcors.com

3295766

June K. Ghezzi
Federal Bar No. CT25650
Joseph P. Shereda
Federal Bar No. CT25651
JONES DAY
77 West Wacker Drive
Chicago, IL  60601
Tel:  (312) 782-3939
Fax:  (312) 782-8585
Email:  jkghezzi@jonesday.com;
        jpshereda@jonesday.com

3295766

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2005, a copy of the foregoing Memorandum in Support of Defendant's Motion to Exclude Testimony of Dr. Larry P. Berstein and Dr. Suzanne Parisian was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

<u>/s/ Thomas J. Riley</u>
Thomas J. Riley

3295766